[Cite as *State v. Fisher*, 2024-Ohio-4484.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-appellee, | : | |
| | | No. 113205 |
| v. | : | |
| DACEE FISHER, | : | |
| Defendant-appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** September 12, 2024

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-672376-D

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Eben O. McNair, Assistant Prosecuting Attorney, *for appellee.*

Law Office of Anthony J. Richardson II, LLC, and Anthony J. Richardson II, *for appellant.*

EILEEN A. GALLAGHER, P.J.:

{¶ 1} Defendant-appellant, Dacee Fisher, appeals his convictions for aggravated murder, murder, involuntary manslaughter, felonious assault, improperly discharging into habitation, improperly handling firearms in a motor

vehicle and having weapons while under disability with various attendant specifications following a bench trial. For the reasons that follow, we affirm.

## I. Factual Background and Procedural History

{¶ 2} On July 15, 2022, a Cuyahoga County Grand Jury returned an indictment charging Fisher with the following offenses:

- Count 1: aggravated murder in violation of R.C. 2903.01(A).

- Count 5: aggravated murder in violation of R.C. 2903.01(B).

- Count 9: murder in violation of R.C. 2903.02(A).

- Count 13: murder in violation of R.C. 2903.02(B).

- Count 17: felonious assault in violation of R.C. 2903.11(A)(1).

- Count 21: improperly discharging into habitation in violation of R.C. 2923.161(A)(1).

- Count 25: felonious assault in violation of R.C. 2903.11(A)(2).

- Count 29: improperly handling firearms in a motor vehicle in violation of R.C. 2923.16(A).

- Count 30: tampering with evidence in violation of R.C. 2921.12(A)(1).

- Count 31: obstructing justice in violation of R.C. 2921.32(A)(5), with a furthermore clause stating that the crime committed by the person aided was aggravated murder, murder or a felony of the first or second degree.

- Count 36: participating in a criminal gang in violation of R.C. 2923.42(A).

- Count 37: involuntary manslaughter in violation of R.C. 2903.04(A).

- Count 40: having weapons while under disability in violation of R.C. 2923.13(A)(2).

**{¶ 3}** Most of the counts carried one- and three-year firearm specifications under R.C. 2941.141(A) and 2941.145(A). Many also carried a 54-month firearm specification under R.C. 2941.145(D) and a criminal gang activity specification under R.C. 2941.142(A). Counts 9, 13, 17, 21, 25 and 37 carried a repeat violent offender specification under R.C. 2941.149(A). Counts 17, 21, 25 and 37 carried a notice of prior conviction under R.C. 2929.13(F)(6). Counts 21, 25, 29 and 36 carried a five-year "drive by shooting" firearm specification under R.C. 2941.146(A). Counts 21 and 25 carried a 90-month "drive by shooting" firearm specification under R.C. 2941.146(C).

**{¶ 4}** The charges stemmed from an investigation into the shooting death of 17-year-old Hershawna Rias in Martin Luther King Jr. Park in Cleveland on April 8, 2021, and the drive-by-shooting of a residence on East 108th Street in Cleveland that same morning. Several codefendants were also named in the indictment — Dion Ransom, Jimmy Wilborn, Esperanza Lugo and Veronica D. Washington.

**{¶ 5}** The State's theory was that Fisher, the codefendants and Rias planned a robbery at the East 108th Street residence. On the night of the robbery, Fisher killed Rias after growing concerned that Rias was "double-crossing" them. The group then drove to the East 108th Street residence, where two codefendants fired bullets from their moving vehicle into the house. The defense asserted that Fisher was at his house, asleep, on the night in question and played no role in the shootings.

### A. The Examination of Denise Jennings

{¶ 6} Denise Jennings testified that she lives on Elk Avenue in Cleveland, close to Martin Luther King Jr. Park. On April 8, 2021, she was awakened at approximately 3:30 a.m. by the sound and headlights of a vehicle that "seemed to be repeatedly coming around in that area." She estimated that she heard the same vehicle three times. She went back to sleep and was reawakened at approximately 5:00 a.m. by the sound of the vehicle returning. She thereafter heard two car doors open and shut and then heard two gunshots. A few minutes later, she heard a car door shut and then the car "drove off." Another car passed by as well. "Moments" later, she heard more gunshots.

### B. The Examination of Duane Crawford, Sr.

{¶ 7} Duane Crawford, Sr., testified that in April 2021 he was living at a residence on East 108th Street in Cleveland with his two children. In the early morning hours of April 8, 2021, his son woke him to tell him that someone had "just shot up" the house. Duane Sr. observed drywall dust scattered around his bedroom and saw bullet holes to the exterior of the house. Bullets were fired into both the first and second floors of the home.

### C. The Examination of Duwan Crawford

{¶ 8} Duwan Crawford testified that he is Duane Crawford, Sr.'s son. Duwan lived at the residence on East 108th Street on the night of the shooting. That night, Duwan was in his room on the second floor of the house when he heard gunshots outside. A bullet entered through his bedroom window. Duwan ducked for cover

and called his brother, Duane Crawford, Jr. on the phone. When Duane Jr. arrived, the two brothers went into their father's room, where they observed that the room was "cloudy" from "gun smoke."

### D. The Examination of Duane Crawford, Jr.

{¶ 9} Duane Crawford, Jr., testified that in April 2021 he was in a casual romantic relationship with Hershawna Rias; the relationship was over a year old at that point. They would "spend time with each other, spend the night, go out for walks and stuff like that" but did not consider themselves to be "together" for that entire time; they were "on and off."

{¶ 10} On April 7, 2021, Duane Jr. communicated with Rias while he was at work about meeting up with each other; Rias said "[s]he had something to tell [Duane Jr.] or talk to [him] about." Duane Jr. went home from work, got his brother's car and drove it to the west side of Cleveland to "meet two other females." He estimated he got home from work at 11:40 p.m. He picked the two women up and the three of them drove around "for a good bit of time," a couple of hours. They smoked tobacco and marijuana, went to a store and bought some food and just generally hung out together. They drove between Lorain County and the east side of Cleveland.

{¶ 11} Duane Jr. dropped off the two women with whom he was traveling sometime between 4:00 and 5:00 a.m. on April 8, 2021 and then went to a gas station to put gas in the car. Surveillance video captured Duane Jr. at the gas station

at 5:25 a.m. He testified that while he was pumping gas, he received a call from his brother Duwan that caused him to rush home.

{¶ 12} When Duane Jr. arrived home, he saw holes in the walls of the home that were not there earlier in the day. He ran upstairs to check on his brother and the two then woke their father up.

{¶ 13} Throughout that evening, Duane Jr. was texting with Rias. Rias expressed that she wanted to see Duane Jr. for sex and to talk about something. Duane Jr. had a "weird" feeling about these messages because he and Rias were having "relationship problems" at that point in time. Rias said she wanted to talk to him in person. At 3:02 a.m., Rias asked him why he was not answering her phone calls. At 5:03 a.m., Duane Jr. asked if Rias was awake and Rias responded that she was. The last message came from Rias at 5:10 a.m., in which she expressed that she was being serious.

{¶ 14} On cross-examination, Duane Jr. admitted that in April 2021 he would frequently have cash on his person, around $100 at a time. He also frequently possessed firearms. In April 2021, Duane Jr. had a Colt handgun. Duane Jr. did not talk to Rias about how much money he had; "If she wanted something, I'd spend the money for it," he said. He further testified that gunshots are frequently heard in the neighborhood around East 108th Street. He refused to identify the two women with whom he was driving that evening.

### E. The Examination of Patrick Wells

{¶ 15} Patrick Wells testified that he is employed as a police officer with the Cleveland Police Department. Wells responded to the Crawford residence on April 8, 2021, in response to a call for shots fired. When he arrived, he observed multiple cartridge cases on the street and saw that the house was damaged. He believed that the cartridge cases were a mix of .223-caliber and .380-caliber. The State played a recording from his body-worn camera.

{¶ 16} In all, police collected twelve cartridge cases that appeared to be .223-caliber and seven .380-caliber cartridge cases from the scene.

### F. The Examination of Thomas Lascko

{¶ 17} Thomas Lascko testified that he is employed as a detective with the Cleveland Police Department's crime scene and records unit. On April 8, 2021, Lascko responded to a residence on East 108th Street to photograph the scene in reference to a report that someone fired bullets into the residence. He observed what appeared to him to be bullet holes on the exterior of the house and bullet defects throughout the first and second floors of the house.

### G. The Examination of William A. Berry, III

{¶ 18} William A. Berry, III, testified that in April 2021 he was employed as a work crew supervisor for a community-work-service nonprofit organization. On April 8, 2021, he and his crew were driving a preplanned route, picking up debris around the city. At around noon, he drove near Martin Luther King Jr. Park and observed a body lying on the ground inside the park. He attempted to get the

person's attention, thinking they may need help of some kind. When the person did not respond, he investigated further and then called 9-1-1. When he got to about 15 feet away, he observed that the person was deceased. He stayed on scene until police arrived.

### H. The Examination of Swayne Jackson

{¶ 19} Swayne Jackson testified that on April 8, 2021, he was employed as a patrol officer with the Cleveland Police Department. He responded to a call at Martin Luther King Jr. Park in reference to a possible deceased person discovered near the park. He spoke to the community-work-service participants and then canvassed the area seeking information on the shooting.

### I. The Examination of Michael Hale

{¶ 20} Michael Hale testified that he is employed as a detective with the Cleveland Police Department's Crime Scene Unit. He responded to Martin Luther King Jr. Park on April 8, 2021, and photographed the crime scene.

{¶ 21} On cross-examination, Hale admitted that police did not locate any spent bullets or cartridge cases in the park.

### J. The Examination of Cristin McCaskill

{¶ 22} Cristin McCaskill testified that she is employed as a special agent with the Federal Bureau of Investigation and she works in partnership with the Cleveland Police Department on homicide investigations.

{¶ 23} McCaskill responded to the park on the day of the shootings. Investigators could not immediately identify the deceased person in the park

through a biometric database, but she was ultimately identified as 17-year-old Hershawna Rias.

{¶ 24} McCaskill canvassed the area looking for witnesses or cameras that may have captured relevant video. After canvassing, police began looking for a Toyota Rav4 and a red sedan that they believed may have been involved in the shootings. Police ultimately identified that the Rav4 was registered to a woman and further identified that Fisher lived at that woman's address and frequently drove the Rav4.

{¶ 25} Investigators located the Rav4 in a parking lot on April 13, 2021. It was seized pursuant to a search warrant.

{¶ 26} McCaskill participated in a search of codefendant Dion Ransom's girlfriend's apartment on East 40th Street in March 2022. Ransom had posted a picture to a social-media service that depicted a long gun and a handgun resting on a brown wood table; police located the table at the apartment during their search but did not find any working firearms. Police did find a paper bag containing .223-caliber ammunition, an empty gun box and a rifle magazine. The magazine would have been compatible with the long gun depicted in Ransom's social-media photograph, which gun would have been capable of firing .223-caliber bullets.

{¶ 27} On cross-examination, McCaskill admitted that the East 40th Street apartment was rented under the name of a woman. The woman, during the search, told police that the firearm that belonged in the firearm box was hers and that it had been stolen at a nightclub in 2020. McCaskill further admitted that she did not

know if the magazine or any of the ammunition was compared to other evidence in the case for ballistic identification. She further admitted that she does not know how many people routinely drove the Toyota Rav4.

**K. The Examination of Thelemon Powell, Jr.**

{¶ 28} Thelemon Powell, Jr. testified that he is employed as a detective with the Cleveland Police Department and is assigned to the homicide unit. Powell participated in the search of the Toyota Rav4 in connection with this investigation. The vehicle was searched on April 21, 2021.

**L. The Examination of Dr. Joseph Felo**

{¶ 29} Joseph Felo testified that he is employed as a forensic pathologist and the chief deputy medical examiner in Cuyahoga County. The parties stipulated that he is an expert in the field of forensic pathology.

{¶ 30} Dr. Felo responded to the public park where Rias' body was discovered. He examined the scene and the victim. Rias had apparent bullet wounds to the forehead, left chest below the collarbone and left arm. Police and paramedics arrived on scene at approximately 11:43 a.m., and Dr. Felo concluded that Rias had died several hours earlier on the morning of April 8, 2021. He then continued participating in the investigation of her death, including performing her autopsy.

{¶ 31} The autopsy confirmed that Rias died from the two gunshot wounds to her head and chest, which caused injuries to the brain and left lung. Either bullet would have been fatal on its own.

{¶ 32} Dr. Felo recovered several bullet fragments from Rias' body and determined that the fragments came from "medium caliber jacketed bullets." He ruled out .22-caliber- and .45-caliber rounds and rifle rounds. Based on his examination, he concluded that the gun was more than three feet away from Rias when it was discharged.

{¶ 33} Toxicology testing revealed the presence of methamphetamine, tobacco and marijuana in the body of Rias. The level of methamphetamine indicates that she was actively under the influence of the stimulant drug when she died. She was not actively under the influence of marijuana.

### M. The Examination of Lisa Przepyszny

{¶ 34} Lisa Przepyszny testified that she is employed as a forensic scientist in the trace evidence department at the Cuyahoga County Regional Forensic Science Laboratory. The parties stipulated that she is an expert in the field of trace evidence.

{¶ 35} Przepyszny collected swabs from Rias' body and sent them to the DNA department. She examined the clothing Rias was wearing at the time of her death and determined that the gun that killed her was either distant when it was fired (four feet or more away) or the bullets passed through an intervening object before striking her.

### N. The Examination of Nasir Butt

{¶ 36} Nasir Butt testified that he is employed as the DNA technical manager and the supervisor for the DNA section in the Cuyahoga County Regional Forensic Science Laboratory. The parties stipulated to his qualification as an expert.

{¶ 37} Butt served as the technical reviewer for the DNA analysis performed by the science laboratory in this investigation.

{¶ 38} DNA found on Rias' right hand and wrist, including from under her fingernails, matched to Fisher. Fisher was excluded as a contributor to DNA found on the victim's left wrist and under the victim's left-hand fingernails.

{¶ 39} A swab collected for indications of sexual activity revealed the presence of presumptive seminal fluid. DNA found on the swabs matched to Duane Crawford Jr. and Fisher.

{¶ 40} DNA found inside of the Rav4, including on the driver's side, front passenger side and on the rear doors matched to Fisher. The victim's DNA was found on the rear door handle. Codefendant Esparanza Lugo's DNA was found on the driver's side and front passenger side door panels.

{¶ 41} On cross-examination, Butt admitted that codefendant Dion Ransom was excluded as a contributor of DNA found on the victim's body. Codefendant Jimmy Wilborn's DNA was not found on any item of evidence.

**O. The Examination of Arthur Echols**

{¶ 42} Arthur Echols testified that he is employed as a homicide detective with the Cleveland Police Department. He participated in the investigation of the homicide of Hershawna Rias.

{¶ 43} Police reviewed surveillance video from city-owned and privately owned cameras and identified two vehicles that were in the area of the murder around the time that a witness reported hearing gunshots. Police correlated

information found on the victim's phone and identified a specific Toyota Rav4 that they believed may have been involved in the shooting. Police learned that the vehicle was parked in a parking lot in Euclid, Ohio and they seized the vehicle pursuant to a search warrant.

{¶ 44} In January 2022, police arrested codefendant Veronica Washington at her mother's apartment.

{¶ 45} In March 2022, police searched Ransom's apartment. Ammunition and a magazine were recovered.

{¶ 46} Several phones were also searched in connection with this investigation: the victim's phone, Lugo's phone, Fisher's phone, two phones from Ransom, Wilborn's phone and Washington's phone.

{¶ 47} On cross-examination, Echols admitted that the ammunition and the magazine found in Ransom's apartment had not been forensically linked to the murder of Rias and did not match the spent cartridge cases from the drive-by shooting.

**P. The Examination of James Kooser**

{¶ 48} James Kooser testified that he is employed as a firearms and tool mark examiner at the Cuyahoga County Regional Forensic Science Laboratory. The parties stipulated that he is an expert.

{¶ 49} Two bullets recovered from Rias' body were submitted for his examination. He concluded that the bullets were consistent with either .38- or .357-magnum-caliber bullets. The characteristics were consistent with revolvers made

by several manufacturers.  He concluded that the bullets were fired from the same gun.

{¶ 50} Kooser examined twelve cartridge cases collected from the scene of the drive-by shooting and concluded that all the cartridge cases were fired from the same gun.

### Q. The Examination of Brian Middaugh

{¶ 51} Brian Middaugh testified that he is employed as a special agent with the U.S. Bureau of Alcohol, Tobacco, Firearms & Explosives.  Middaugh received a tip regarding the location of a cellphone belonging to Fisher.  Middaugh retrieved the phone and delivered it to a homicide detective working this investigation.

### R. The Examination of Tommy Manson

{¶ 52} Tommy Manson testified that he is employed as a crime scene detective with the Cleveland Police Department.  On April 18, 2021, Manson took photographs and collected evidence during the execution of a search warrant at Fisher's home on Harvard Avenue.

### S. The Examination of Veronica Washington

{¶ 53} Veronica Washington testified that she met with Dion Ransom on April 7, 2021 for the purpose of having sex with him and that they were in a casual sexual relationship at that time.  Around dusk, Washington went to a house on Union Avenue in Cleveland.  When she arrived, a number of people were already there, including Ransom, a friend of Ransom's whose name Washington did not

know, Fisher, Lugo and Rias. At some point during the night, Wilborn arrived at the house.

{¶ 54} Late in the night of April 7 or early in the morning of April 8, 2021, Washington drove Ransom to a residence near East 40th Street where Ransom's girlfriend lived. Washington was driving a red Ford Fusion. Ransom said he needed to pick up some things from inside. Ransom went inside, leaving Washington alone in the car. Washington fell asleep and was awoken some time later when Ransom knocked on the window. At that time, Ransom was carrying a duffel bag.

{¶ 55} Fisher arrived at the residence near East 40th Street with Lugo, Wilborn and Rias in a Toyota Rav4 which Washington understood was his and that Lugo was driving the Rav4 "the whole night."

{¶ 56} Ransom got into Washington's car and told her to follow behind the Rav4. Ransom told her they were all going to drop Rias off somewhere. In the very early morning hours of April 8, 2021 they drove to the area of St. Clair Avenue in Cleveland where they drove past a house once or twice and then parked in front of Martin Luther King Jr. Park. Washington admittedly had been drinking heavily that night and felt drunk.

{¶ 57} Wilborn approached Washington's vehicle and had a conversation with Ransom in which they discussed "like what was going on, what they were going to do." Ransom told her that they were planning a robbery and that Rias was "supposed to be setting up her brothers" to be robbed.

{¶ 58} Fisher walked to Washington's vehicle, carrying a revolver, and told Ransom that he "felt like [Rias] was setting them up instead of her brothers." Fisher said he was going to kill Rias. Washington pleaded with him not to kill her but Ransom said "he has to."

{¶ 59} Fisher then walked back to the Rav4, told Rias to get out of the car, walked with her into the park and shot her twice.

{¶ 60} Washington then drove around the corner and Ransom told her to slow down. They stopped in front of the house they had previously driven past and Ransom shot into the house with a rifle. Washington then drove him back to the house on Union Avenue, where Ransom dropped off the rifle. The two of them then drove to Fisher's apartment on Harvard Avenue to meet with Fisher, Wilborn and Lugo. They got there just as the sun was beginning to rise on April 8, 2021. Everyone went to sleep without discussing the night's events.

{¶ 61} Ransom at some point told her to "[c]alm down, don't say nothing, keep your mouth closed, don't repeat nothing to nobody."

{¶ 62} After waking on April 8, 2021, Washington drove Ransom into downtown Cleveland and they then drove to South Carolina. Fisher and Lugo met them in South Carolina where they all stayed for a few days.

{¶ 63} Washington was arrested in January 2022 and admitted that she initially lied to the police. She believed that she was pregnant with Ransom's child at the time and felt that lying would protect Ransom. Ultimately Washington pleaded guilty to reduced charges in exchange for her testimony.

{¶ 64} Washington made an in-court identification of Fisher.

{¶ 65} On cross-examination, Washington admitted that she was charged with murder but the charge was dropped as part of the plea agreement. It was her belief that if she were convicted as originally charged, she would die in prison; after the plea agreement, she is praying to receive probation. Washington admitted that the only people visible in the surveillance video are her and Lugo.

{¶ 66} Washington admitted that when she was arrested in January 2022, she said she did not know the victim and had never seen her. After police said they had already arrested Lugo, Washington told the police that Washington and Lugo drove to the area of the park and dropped Rias off, never seeing her again. Washington told the police that no one else was in the car with either Washington or Lugo. Washington said she did not know who killed Rias.

{¶ 67} Later in the interview, Washington said that there was someone in the car with Lugo, a man that Washington did not know and had never met before, and this unknown man was the killer and the person who shot into the house. She claimed she did not know what was going on or what was going to happen.

{¶ 68} When pressed for more details, Washington told police that Rias had set up a robbery that night and that — in addition to the unknown male in Lugo's car — Fisher was there, too. The unknown male killed Rias and Fisher shot into the house.

{¶ 69} It was only after the special agent asked her, "[I]t was [Fisher] that killed her, wasn't it?" that she said that Fisher killed Rias. In this version of the story,

Lugo called Washington during the drive and said that "there's been a double cross." Washington still denied that Ransom was involved.

{¶ 70} After speaking with Ransom following her arrest and feeling "abandoned" by him, she told police that Ransom was involved.

{¶ 71} Washington further admitted that she only heard a rifle firing into the house and Fisher did not have a rifle.

{¶ 72} Washington was recalled as a witness outside the presence of the jury to offer testimony relevant to the gang-activity charges which had been bifurcated for purpose of trial since Fisher and Ransom were being tried together but Fisher had waived a jury.

{¶ 73} Washington testified that she was previously a member of a gang called the Rollin' 20s Cripps. She learned about the gang after Rias was killed, when she and Ransom drove down to South Carolina together. Ransom asked her several times on that trip whether she wanted to join the gang. She agreed and, at one point, exited a vehicle with the intention of engaging in a fight, which she understood to be a necessary step toward initiation into the gang. Ransom and Lugo were with her at the time; Lugo also intended to join the gang. Ransom then told Washington that she did not have to fight because she "already put work in." She understood this to mean that she did not have to fight because she was present for and drove the vehicle used in connection with Rias' murder. Lugo similarly did not have to fight in order to join the gang.

{¶ 74} Ransom, Washington and Lugo were in South Carolina for a "roll call" of the Cripps gang, during which members hung out together and announced their names and said where they were from.  Members were wearing gold, black and blue — the Cripps' colors.  Fisher was in South Carolina at the time but did not participate in the roll call.  Washington understood that Fisher was a member of the gang and that Ransom had sponsored him. She identified Fisher in a photograph taken at a bar in South Carolina during this trip and she further identified Fisher making a hand gesture that she said referred to the gang and she also understood that Wilborn was a member of the gang.

{¶ 75} According to Washington, Ransom was a leader in the local Cripps gang; he would "[t]ell people what to do, when to do it and how to do it."

**T. The Examination of Esperanza Lugo**

{¶ 76} Ezperanza Lugo testified that in 2021 she lived in Columbus, Ohio. Beginning in March 2021, after meeting through a mutual friend and becoming close, she began periodically staying in Cleveland with Fisher at his apartment on Harvard Avenue.

{¶ 77} Lugo first met Rias on April 6, 2021.  Lugo was at Edgewater Park in with Fisher and Ransom, smoking and drinking together.  Rias was also in the park and told them that she was waiting for a ride.  Fisher invited Rias to join them and they then went to his Harvard Avenue home.  Rias slept over that night, staying with Fisher in his room.

{¶ 78} The next day — April 7, 2021 — Fisher drove Rias and Lugo around in his black Toyota SUV; they were just driving together, smoking, talking and listening to music.

{¶ 79} In the car, Rias proposed a plan to Fisher to rob someone. Lugo understood that the prospective victim was either Rias' boyfriend or ex-boyfriend. Rias said that there would be guns, cash and credit cards at the house. Lugo's understanding was that Fisher brought the plan to Ransom. Fisher called Wilborn and asked him to come to Cleveland.

{¶ 80} At approximately 10 p.m., Fisher drove Lugo and Rias to a house on Union Avenue. Ransom, Washington and Wilborn were either there when they arrived or joined them later.

{¶ 81} That night, Fisher, Lugo, Rias and Wilborn went back to the Harvard Avenue apartment to wait for the prospective robbery victim to return home. Rias told them she was texting with the prospective victim.

{¶ 82} At approximately 4 a.m., the four people got into Fisher's Toyota Rav4 together. Lugo was driving and Rias was seated in the front passenger seat. Fisher was in the rear passenger-side seat and Wilborn was in the rear driver's-side seat. They drove to an apartment complex where they met Ransom and Washington, who were seated in a red or maroon four-door car.

{¶ 83} Rias did not know the exact address of the prospective victim's residence, so she typed the street name into a mapping application. When they got close to the general area, they began "just driving around looking for the place." At

some point, both cars parked and Washington — who was driving the red car — took the lead.  Rias pointed out the house and both cars parked around the corner, near Martin Luther King Jr. Park.

{¶ 84} While parked there, Wilborn and Fisher exited her car and entered the red car.

{¶ 85} Fisher returned to the Toyota, approaching on the passenger side and opening the front passenger door.  Fisher instructed Lugo to wait in the car by her phone.  Fisher instructed Rias to communicate with the prospective victim "to try to get them to come outside and at that point we'll rush in."  Fisher and Rias walked together into the park.  Lugo then heard and saw two flashes.

{¶ 86} Lugo drove to the stop sign at the intersection of East 107th and Elk Avenue.  Fisher "rush[ed] to the car, knock[ed] on the window and [told] me to let him in."  Lugo did so and Fisher instructed her to drive.  The red car began driving away and Lugo followed in the Toyota.  As they drove past the prospective robbery victim's house, "bullets start coming from [Washington's] car into the [victim's] house."  She saw "one large gun protruding from the window"; it looked like a rifle.  At the time of this shooting, Washington, Ransom and Wilborn were in the red car.  Neither Lugo nor Fisher fired any shots into the house.

{¶ 87} The cars were then driven back to the Union Avenue home.  Wilborn had left his phone in that house and wanted to retrieve it. At that residence, Washington "started discussing another robbery that she wanted to pull."

{¶ 88} From there, everyone — Washington, Ransom, Lugo, Fisher and Wilborn — drove to the Harvard Avenue apartment. Lugo began cleaning the apartment while everyone else slept. Later that morning, Washington drove Ransom from the house and Lugo woke Wilborn and drove him to Akron.

{¶ 89} Later on April 8, 2021, Lugo and Fisher drove together to Greenville, South Carolina. They met Washington and Ransom in Greenville as Washington and Ransom had traveled separately. They stayed in Greenville for two nights, meeting others at a bar.

{¶ 90} Lugo was approached by law enforcement later in April 2021 and consented to a search of her phone. She initially lied about her involvement in the shootings. When she met with detectives a second time she again consented to a search of her phone and again lied about her involvement in the crimes.

{¶ 91} Ultimately, Lugo was arrested and charged. She entered a plea agreement and pleaded guilty to two second-degree felonies with attached firearm specifications.

{¶ 92} On cross-examination, Lugo reiterated that Fisher did not shoot into the Crawford residence and was not in the car from which the shots were fired. She further admitted that she did not see Fisher with a rifle and did not hear him encourage or assist anyone with that shooting.

{¶ 93} She further admitted that, with respect to the Rias murder, she saw the flashes of the gun from her rearview mirror from a car that was parked around

200 feet from the park. She could not see into the park and so she did not know how many people were in the park at the time of the shooting.

{¶ 94} Lugo further admitted that, at the time of the murder, she was in a sexual relationship with Fisher. She texted a friend before the murder and said that Fisher was making Rias "feel special" and called Rias a "ho."

{¶ 95} She further admitted that on the night of the murder, she had smoked marijuana and drank "a little less than a fifth" of tequila and took ecstasy to keep her awake.

{¶ 96} The first story she told police was that Fisher stayed at the Harvard Avenue apartment as she drove Rias to a relative's house, returning home at 4:30 a.m. and going to sleep.

{¶ 97} She did not see anything in Fisher's hands when he returned to the car from the park; she did not see him with a gun.

{¶ 98} She requires glasses to see distance but was not wearing glasses on the night of the murder.

{¶ 99} Lugo further admitted that, during one interview with the police, she told them that she "got back into the car" after the murder, suggesting that she had been outside the car at the time of the murder; she said this was a "[s]lip of the tongue."

{¶ 100} On redirect, Lugo testified that the story she initially told police was a lie concocted by herself and Fisher.

{¶ 101} Lugo was recalled as a witness outside the presence of the jury to testify relevant to the gang-activity charges.

{¶ 102} Lugo was aware in February 2021 that Fisher and Ransom were members of the Rollin' 20s Cripps. She said their membership was "[o]penly said and shown."

{¶ 103} Between February and April 2021, she met other members of the gang, including at parties at the Union Avenue house, which was used by members for parties, drinking and smoking. Fisher and/or Ransom would always be at the house when she was there.

{¶ 104} Lugo invited herself on the trip to South Carolina and Fisher approved of her going with them. She had been dating another gang member for about a month at that point. Gang members allowed Lugo into the gang in South Carolina. She thought that she would have to be "jumped in" but ultimately did not have to fight anyone.

## U. The Examination of David Scheppegrell

{¶ 105} David Scheppegrell testified that he is employed as a senior vice president with a company called Sentinel Offender Services. A subsidiary of Sentinel manufactures ankle monitors and Sentinel contracts with government agencies to provide that technology. In response to a subpoena, Scheppegrell provided the State with location data from an ankle monitor worn by Jimmy Wilborn.

{¶ 106} The location data reflected that Wilborn traveled from his home in Akron to Cleveland on April 7, 2021; he left at around 10:30 p.m. He arrived at the

house on Union Avenue in Cleveland at around 11:30 p.m. He remained in the vicinity of the home until just before 2:00 a.m. on April 8. He then traveled to Fisher's home on Harvard Avenue in Cleveland, arriving at around 2:25 a.m. He remained in the vicinity of that home until just after 4:15 a.m. He then traveled to a building near the intersection of E. 40th Street and Bohn Road in Cleveland, arriving just after 4:30 a.m. He then traveled to the intersection of East 107th Street and Elk Avenue — near Martin Luther King Jr. Park — arriving just after 5:00 a.m. He was traveling again by 5:09 a.m., moving on streets near the Crawford residence on East 108th Street before returning to the area of the park. He arrived back at the park at approximately 5:13 a.m. He remained at the intersection of East 107th Street and Elk Avenue until 5:17 a.m. He then traveled back to the area around the Union Avenue house, arriving at approximately 5:40 a.m. He stayed there for about ten minutes before traveling to the area of Fisher's home on Harvard Avenue; he arrived there just before 6:00 a.m. and stayed in that area for three hours. Just after 9:00 a.m., Wilborn left and traveled back to his home in Akron, arriving around 9:40 a.m.

### V. The Examination of Jason Kunkle

{¶ 107} Jason Kunkle testified that he is employed as a special agent with the Federal Bureau of Investigation and supervises the FBI's Mansfield and Canton offices. He is one of about 80 special agents nationwide that are assigned to the FBI's Cellular Analysis Survey Team for which he received specialized training in locating cellphones based on the records of cellular-communications providers. The parties stipulated that he is an expert in historical location analysis.

{¶ 108} Kunkle testified that communications providers record the date and time of communications that occur from a particular cellphone and the cellphone tower used. The records further identify which side of a tower, which "sector," a communication used. This information can locate a cellphone within an area the size of several square miles. This data alone cannot precisely locate someone beyond that general area and does not reveal who was using the phone or the content of any communications.

{¶ 109} Kunkle reviewed cellphone records association with seven different phone numbers in connection with this investigation — those belonging to Rias, Lugo, Fisher, Ransom (two numbers), Washington and Wilborn.

{¶ 110} Phones belonging to Rias, Lugo, Fisher and Ransom were in the area around Edgewater Park in Cleveland at various times between 8:45 p.m. and 10:00 p.m. on April 6, 2021. Wilborn's phone was located in Akron between 9:00 p.m. and 9:15 p.m. that day. Washington's phone was in the University Circle area at 9:47 p.m. that day.

{¶ 111} Between 12 a.m. and 2 a.m. on April 8, 2021, phones belonging to Rias, Washington, Fisher, Wilborn and Ransom were located in the general area of the Union Avenue home.

{¶ 112} Phones belonging to Fisher and Rias were in the general area of the Harvard Avenue residence at various points between 2:00 a.m. and 4:22 a.m.

{¶ 113} Phones belonging to Washington and Ransom were in the general area of the Union Avenue home at various points between 2:07 a.m. and 3:19 a.m.

They were in the general area of the E. 40th Street residence at various points between 4:05 a.m. and 4:22 a.m.

{¶ 114} A phone belonging to Wilborn was located in the general area of the Union Avenue home at 5:43 a.m.

{¶ 115} Phones belonging to Washington and Fisher were in the general area of the Harvard Avenue residence at 7:08 a.m. and 7:40 a.m., respectively.

{¶ 116} Phones belonging to Ransom and Washington used the same side of the same cell tower in downtown Cleveland at various times between 9:23 a.m. and 11:30 a.m. on April 8, 2021. The phones then travel south to Greenville, South Carolina together between 11:45 a.m. on April 8 and 3:30 a.m. on April 9, 2021.

{¶ 117} Phones belonging to Fisher, Washington, Lugo and Ransom were in the same area of Greenville, South Carolina on April 10, 2021.

{¶ 118} On cross-examination, Kunkle admitted that the records he reviewed were limited to those involving voice calls and text messages. He did not review location data from phone data usage.

### W. The Examination of Johnathan Dayton

{¶ 119} Jonathan Dayton testified that he is employed as a detective with the Cleveland Police Department, assigned to the homicide unit.

{¶ 120} Detective Dayton testified that the red Ford Fusion seen in the surveillance video was never recovered and, based on his review of the surveillance videos, there is no sign that the drivers of the vehicles were impaired by alcohol.

{¶ 121} Dayton was recalled outside the presence of the jury to testify relevant to the gang-activity charges. Dayton was assigned to the gang-impact unit from 2013 to 2021. Dayton reviewed screenshots from social-media accounts belonging to Fisher and Ransom and identified what he considered to be gang-related iconography. Dayton reviewed messages exchanged between Fisher and Wilborn and identified what he considered to be language referencing the gang. Other messages in Fisher's phone reference firearms. Videos on Fisher's phone show people engaged in physical fights, which Dayton understood to be gang initiations.

{¶ 122} Dayton is aware that the Rollin' 20s Cripps engage in "[n]umerous different criminal activities" including murder, robbery, assault and weapons offenses.

{¶ 123} Dayton was present for Fisher's interview with investigators. Fisher admitted that he met Rias at the lake. He admitted that he saw Rias on April 7, 2021 at the house on Union Avenue. Fisher then said that he went home, left home to see a prostitute and then returned home. Fisher invited law enforcement to check location data from his phone to prove that he was not present in the area of the murder.

{¶ 124} Dayton was present for Ransom's interview with investigators. Ransom admitted being a member of the Cripps and said that, to become a member, an initiate has to fight two other members for two minutes. Wilborn also acknowledged prior membership in the Rollin' 20s Cripps during an interview.

## X. The Examination of Andrew Burke

{¶ 125} Andrew Burke testified that he is employed as a special agent with the Federal Bureau of Investigation and participated in this investigation as part of a collaboration between the FBI and the Cleveland Police.

{¶ 126} Using location data from Rias' phone, compared against city cameras and license-plate readers, investigators were able to determine that Rias was travelling in a black Toyota Rav4 before she was killed. Using license-plate readers, investigators identified that the vehicle was located in a parking lot in Euclid.

{¶ 127} Investigators also extracted the stored contact information for Fisher from Rias' phone. The contact was created on 9:26 p.m. on April 6, 2021.

{¶ 128} The search history on Rias' phone demonstrated that someone searched for information regarding the area of East 108th Street and St. Clair Avenue in Cleveland.

{¶ 129} Rias' phone was plugged into a power source from 4:18 a.m. to 5:10 a.m. on April 8, 2021. At 5:15 a.m., Rias' phone disconnected from a WiFi hotspot emanating from Lugo's phone.

{¶ 130} Investigators obtained records from Ransom's account on Facebook. On April 13, 2021, Ransom sent a message to a group of users on the application stating that "[p]olice just got [Fisher]." The timing of that message corresponded to the time police were making contact with Fisher. A few minutes later, while police were converging on the Toyota Rav4, Ransom sent another message stating that "the police ran in diamond's spot." A user with the name "Diamond" then offered to

speak over the phone.  Ransom responded that they could speak in person but not over the phone.

{¶ 131} This group chat was later found on Fisher's phone as well.

{¶ 132} Burke was present when investigators interviewed Fisher in connection with the investigation.  Fisher admitted that he met Rias at Edgewater Park on April 6, 2021.

{¶ 133} The contact for Ransom stored in Lugo's phone was created on February 23, 2021.

{¶ 134} By the fall of 2021, law enforcement had not identified the Ford Fusion seen in the city camera videos around the time of the murder.  However, in October 2022, using phone contacts and searching for traffic citations issued to those contacts, investigators discovered that Veronica Washington had received two traffic tickets while driving a red Ford Fusion in March 2021.  Special Agent Burke reviewed body-camera recordings from those traffic stops and was able to identify the vehicle through certain distinguishing features — including a pink and black steering-wheel cover — as the red Ford Fusion for which they had been searching.

{¶ 135} Investigators then obtained Washington's phone records and determined that her phone was in the area of the homicide at approximately 5:10 a.m. on the morning of the murder.  Washington was arrested and her phone was seized and searched.

{¶ 136} On Washington's phone was a photograph that Washington took of herself on April 7, 2021, in which she was wearing a blue dress and a "sparkly face

mask" that appeared similar to the attire worn by the driver of the red Fusion in the surveillance video from the date of the murder.

{¶ 137} There came a time when Dion Ransom was arrested; two of his phones were seized and police were able to search one of the phones.

{¶ 138} On Ransom's phone was a photograph taken at 7:15 p.m. on April 6, 2021, at Edgewater Park.

{¶ 139} Ransom's phone exchanged numerous text messages with Fisher's phone. On December 24, 2020, Ransom sent Fisher a photograph of a rifle and a handgun on top of a brown wood-grain table that police ultimately identified in the search of the apartment on E. 40th Street. On the same day, Ransom sent the photograph to another contact with the message, "Don't show nobody." Investigators also found a series of text messages between Ransom and a gunsmith, in which Ransom said he was looking for parts — including a firing pin and attachments — for a NATO .556 rifle. Investigators interviewed the gunsmith, who denied having done business with Ransom. Other messages included Ransom discussing .556-caliber ammunition.

{¶ 140} As of November 2021, Ransom had blocked Lugo's contact number in his phone.

{¶ 141} There was a photograph posted to Ransom's profile on Facebook that showed Ransom sitting on the outside stairs at the Union Avenue address. The photograph was uploaded on May 4, 2021. There were a series of missed calls and

messages on Ransom's Facebook profile from April 8, 2021. On April 8, 2021, Ransom responded, "[I] left my phone at Shay house I told u what we was on . . . ."

{¶ 142} Investigators also obtained a letter Ransom wrote to a woman in which Ransom described what prosecutors would likely ask her in connection with the investigation and telling her what he wanted her to say, including that the photograph of the guns was not from Ransom. Ransom also texted a woman at 7:31 a.m. on the morning of the murder and said, "I'm cool baby didn't go the way we wanted it to I'm at cuhz spot." Ransom has referred to Fisher numerous times in text messages as "cuhz."

{¶ 143} At 4:22 a.m. on the day of the murders, Ransom's phone (located at his home) called Fisher's phone (located at Fisher's apartment), but the call was not answered. At 4:24 a.m., city cameras pick up the Rav4, with a person matching Rias' description in the passenger seat. Wilborn is also located in the car, based on his GPS monitor.

{¶ 144} Burke searched Fisher's phone and learned that Fisher communicated with Ransom about the address on Union. Fisher then sent the address to Wilborn.

{¶ 145} There is a "conspicuous" absence of location data on Ransom's phone and Washington's phone during the time of the murders, which could indicate that the phones were turned off or put into "airplane mode."

{¶ 146} On cross-examination, Burke admitted that no DNA swab was collected from Veronica Washington to compare against any of the profiles developed in the case.

### Y. Motion for Judgment of Acquittal

{¶ 147} After the State rested, Fisher moved for acquittal pursuant to Crim.R. 29 with respect to all charges and specifications. The trial court granted the motion as to Counts 30 (tampering with evidence) and 31 (obstructing justice). It denied the motion as to the remaining counts.

{¶ 148} The defense did not present evidence.

### Z. The Verdict

{¶ 149} On August 21, 2023, the trial court acquitted Fisher of Count 5, Count 13, and Count 36 as well as all the gang-activity specifications. It found Fisher guilty on the remaining charges and specifications.

### AA. The Sentence and Appeal

{¶ 150} The trial court merged Counts 1, 9, 17 and 37 and the State elected to proceed to sentencing on Count 1. The court further merged Counts 21 and 29 and the State elected to proceed to sentencing on Count 21.

{¶ 151} A family member of the victim addressed the court. The State and defense addressed the court. Fisher declined to address the court, on advice of counsel, pending an appeal.

{¶ 152} An aggregate sentence of life in prison with parole eligibility after 45.5 years, as follows was imposed:

{¶ 153} On Count 1 (aggravated murder), the court imposed a 54-month prison term on the firearm specification, to be served prior and consecutive to a term of life in prison with parole eligibility after 20 years.

{¶ 154} On Count 9 (murder), the court merged the underlying felony into aggravated murder but imposed a 54-month prison term on an attached firearm specification, to be served prior and consecutive to the firearm specification in Count 1.

{¶ 155} On Count 21, the court imposed a 54-month prison term on the firearm specification, to be followed by a 90-month term on the other firearm specification, to be followed by an indefinite Reagan Tokes sentence with a minimum term of 7.0 years to a maximum of 10.5 years.

{¶ 156} On Count 25, the court imposed a seven-year prison term.

{¶ 157} On Count 40, the court imposed a 54-month prison term on the firearm specification, to be followed by a 30-month prison term on the underlying felony.

{¶ 158} All the underlying counts were run concurrently to each other. Therefore, Fisher will serve 25.5 of prison time on the various firearm specifications, followed by a life sentence with parole eligibility after 20 years, for an aggregate term of life in prison with parole eligibility after 45.5 years.

{¶ 159} Fisher received 522 days of jail-time credit.

{¶ 160} Fisher appealed, raising the following assignments of error for review:

First Assignment of Error

The matter should be remanded and reversed because there was insufficient competent, credible evidence to support the convictions.

Second Assignment of Error

The matter should be remanded and reversed because, even accepting the verdicts, the alleged actions are a course of conduct and the punishments must merge or Appellant's right against double jeopardy is violated.

Third Assignment of Error

The matter should be remanded and reversed because, even accepting the verdicts, imposing specifications of merged counts ignores the plain language of R.C. 2901.04(A).

## II. Law and Analysis

### A. First Assignment of Error — Sufficiency and Manifest Weight of the Evidence

{¶ 161} Fisher contends that the convictions stemming from the drive-by shooting of the Crawford residence were not supported by sufficient evidence. He further argues that all his convictions are against the manifest weight of the evidence.[1]

{¶ 162} While Fisher challenges every count for which he was found guilty, any error with respect to the sufficiency or manifest weight of the evidence on the felonious assault against Rias (Count 17), involuntary manslaughter (Count 37) and

---

[1] We construe the first assignment of error as including a manifest-weight challenge in light of the specific briefing in this case, but, in the future, counsel should more clearly set forth the challenge in the assignment of error. Appellate courts rule on assignments of error, not mere arguments. *See State v. Gripper*, 2013-Ohio-2740, ¶ 24, fn. 2 (10th Dist.).

improperly handling firearms in a motor-vehicle (Count 29) counts is harmless beyond a reasonable doubt because those counts were merged into other offenses at sentencing. *See, e.g., State v. Ramos*, 2016-Ohio-7685, ¶ 14 (8th Dist.) ("When counts in an indictment are allied offenses, and there is sufficient evidence to support the offense on which the state elects to have the defendant sentenced, the appellate court need not consider the sufficiency of the evidence on the count that is subject to merger because any error would be harmless . . . ."), citing *State v. Powell*, 49 Ohio St.3d 255, 263 (1990). The murder count (Count 9) was also merged, but the trial court imposed a sentence on the specification attached to that count, so we will consider it here.

{¶ 163} Therefore, in addressing this assignment of error, we consider only the convictions for aggravated murder, murder, improperly discharging firearm at or into a habitation, felonious assault (for the drive-by shooting) and having weapons while under disability.

### 1. Standard of Review

{¶ 164} A challenge to the sufficiency of the evidence supporting a conviction requires a determination of whether the State has met its burden of production at trial. *State v. Hunter*, 2006-Ohio-20, ¶ 41 (8th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997). Whether the evidence is legally sufficient to support a verdict is a question of law. *Thompkins* at 386.

{¶ 165} An appellate court's function when reviewing the sufficiency of evidence to support a criminal conviction is to examine the evidence admitted at

trial to determine whether such evidence, if believed, would convince a reasonable juror of the defendant's guilt beyond a reasonable doubt. *Id.*; *see also State v. Bankston*, 2009-Ohio-754, ¶ 4 (10th Dist.) (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the State's witnesses testified truthfully and determines if that testimony satisfies each element of the crime."). We must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 166} A manifest-weight challenge, on the other hand, attacks the credibility of the evidence presented and questions whether the State met its burden of persuasion at trial. *See State v. Whitsett*, 2014-Ohio-4933, ¶ 26 (8th Dist.), citing *Thompkins* at 387; *State v. Bowden*, 2009-Ohio-3598, ¶ 13 (8th Dist.).

{¶ 167} When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the court of appeals sits as a "'thirteenth juror'" and may disagree with "the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). The reviewing court must examine the entire record, weigh the evidence and all reasonable inferences, consider the witness' credibility and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial

ordered. *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). Reversal on manifest weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin*, *supra*.

{¶ 168} The elements of an offense may be proven by direct evidence, circumstantial evidence, or both. *See, e.g.*, *State v. Wells*, 2021-Ohio-2585, ¶ 25 (8th Dist.), citing *State v. Durr*, 58 Ohio St.3d 86 (1991). Circumstantial evidence and direct evidence have "equal evidentiary value." *Wells* at ¶ 26, citing *State v. Santiago*, 2011-Ohio-1691, ¶ 12 (8th Dist.).

### 2. Elements of Offenses

{¶ 169} A person commits aggravated murder by purposely, and with prior calculation and design, causing the death of another. R.C. 2903.01(A).

{¶ 170} A person commits murder by purposely causing the death of another. R.C. 2903.02(A).

{¶ 171} A person commits felonious assault by knowingly causing or attempting to cause physical harm to another by means of a deadly weapon. R.C. 2903.11(A)(2).

{¶ 172} A person commits the offense of improperly discharging a firearm at or into a habitation by knowingly discharging a firearm at or into an occupied structure that is a permanent or temporary habitation for any person. R.C. 2923.161(A)(1).

{¶ 173} A person commits the offense of having weapons while under disability by knowingly acquiring, having, carrying or using a firearm after having been convicted of a felony offense of violence. R.C. 2923.13(A)(2).

{¶ 174} Under most circumstances, a person is subject to a mandatory one-year term of imprisonment if they had a firearm on or about their person or under their control while committing an offense. R.C. 2929.14(B)(1)(a)(iii), 2941.141(A). The mandatory term is three years if the person also displayed the firearm, brandished it, indicated that they possessed it or used it to facilitate the offense. R.C. 2941.145(A). The mandatory term is 54 months if a person who met the criteria for the three-year specification had been previously convicted of or pleaded guilty to a firearm specification. R.C. 2941.145(D).

{¶ 175} Under most circumstances, a person is subject to a mandatory five-year term of imprisonment if (1) they committed an offense that includes, as an essential element, purposely or knowingly causing or attempting to cause physical harm to another and (2) that offense was committed by discharging a firearm from a motor vehicle. R.C. 2941.146(A). The mandatory term is 90 months if the offender previously had been convicted of or pleaded guilty to a firearm specification. R.C. 2941.146(C).

{¶ 176} A person can be found to be a repeat violent offender if (1) they are being sentenced for committing or for complicity in aggravated murder, murder or any first- or second-degree felony offense of violence (or an attempt to commit such an offense, if the attempt itself is a first- or second-degree felony) and (2) the person

was previously convicted of or pleaded guilty to such an offense. R.C. 2941.149(A); 2929.01(CC).

{¶ 177} A person is generally subject to a mandatory prison term if the offender committed a first- or second-degree felony, if the person was previously convicted of or pleaded guilty to aggravated murder, murder or any first- or second-degree felony. R.C. 2929.13(F)(6).

{¶ 178} Ohio's complicity statute, R.C. 2923.03, provides as follows:

No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

(1) Solicit or procure another to commit the offense;

(2) Aid or abet another in committing the offense;

(3) Conspire with another to commit the offense in violation of [R.C. 2923.01];

(4) Cause an innocent or irresponsible person to commit the offense.

{¶ 179} A person who is guilty of complicity in the commission of an offense "shall be prosecuted and punished as if he were a principal offender." R.C. 2923.03(F). To support a conviction based upon complicity by "aiding and abetting" another, "the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson*, 2001-Ohio-1336, syllabus. As this court explained in *State v. Howard*, 2012-Ohio-3459 (8th Dist.):

"In order to constitute aiding and abetting, the accused must have taken some role in causing the commission of the offense. *State v.*

*Sims*, 10 Ohio App.3d 56, 460 N.E.2d 672 (1983). 'The mere presence of an accused at the scene of the crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor.' *State v. Widner*, 69 Ohio St.2d 267, 269, 431 N.E.2d 1025 (1982)."

*Howard* at ¶ 23, quoting *State v. Langford*, 2004-Ohio-3733, ¶ 20–21 (8th Dist.).

{¶ 180} Aiding and abetting may be shown by direct or circumstantial evidence and a defendant's participation may be inferred from the defendant's presence, companionship and conduct before and after the offense is committed. *Howard* at ¶ 23, citing *Langford* at ¶ 21, citing *State v. Cartellone*, 3 Ohio App.3d 145, 150 (8th Dist. 1981). A defendant may aid or abet another by his words, gestures, deeds or actions. *State v. Capp*, 2016-Ohio-295, ¶ 25 (8th Dist.).

### 3. Analysis — The Aggravated Murder of Hershawna Rias

{¶ 181} Fisher does not contend that his convictions for aggravated murder and murder were not supported by sufficient evidence. He instead argues that the verdict on those counts was against the manifest weight of the evidence.

{¶ 182} He points out that Lugo's and Washington's testimony that Fisher killed Rias was inconsistent with previous stories they told investigators, in which they denied that Fisher was present when Rias was killed. He points out that his phone was located in his residence on Harvard Avenue approximately 30 minutes before the murder, which he says is consistent with what he told investigators (that he visited a prostitute and then returned home and fell asleep). He points out that Ransom called his phone at 4:22 a.m. He points out that he is not seen in any of the surveillance videos of the vehicles driving in the city. He argues that it is not

believable that he would be sitting in the rear seat of his own car but that it is more believable that he allowed Lugo to use his car to drive Rias home.

{¶ 183} He argues that Lugo was angry that Fisher was giving attention to Rias and that Fisher and Rias had had sexual intercourse before Rias was killed. He posits that Lugo and Washington wanted to be initiated into a criminal gang but needed to shoot someone to gain admittance; that Lugo picked Rias out of anger and, in a drug and alcohol-fueled "delirium or antisocial state of mind," killed her.

{¶ 184} He points out that Lugo's and Washington's testimony was inconsistent in several ways. Washington testified that only her car moved back to the house on Union Avenue after the murder, but Lugo testified that the Rav4 moved there as well. Washington denied that she wanted to plan another robbery, despite Lugo testifying as much.

{¶ 185} Reviewing the record as a whole, we cannot say that Fisher's conviction for aggravated murder was against the manifest weight of the evidence. "A conviction is not against the manifest weight of the evidence solely because the [factfinder] heard inconsistent testimony." *State v. Wade*, 2008-Ohio-4574, ¶ 38 (8th Dist.). Fisher argued his defense to the trial court and the court was free to reject any portion of the State's evidence or witness testimony that was inconsistent or otherwise unbelievable. The court's acquittal on the gang-related charges and specifications shows that the court did not accept the State's theory of the case wholesale.

{¶ 186} Washington's and Lugo's testimony was largely consistent on the material aspects of Rias' murder. They corroborated each other that the group planned to commit a robbery and stopped outside the park; this testimony was further corroborated through surveillance videos, cellphone location data and location data from Wilborn's ankle monitor. While only the women could be seen in the surveillance video, the fact that others were necessarily in the vehicles is corroborated by location data from Wilborn's ankle monitor. Washington and Lugo corroborated each other that Fisher walked Rias into the park immediately before the shots were fired. Washington testified as to the motive — that Fisher believed Rias was lying to them and intended to set them up for some kind of ambush. The motive is consistent with the group's actions immediately after the murder — shooting into the Crawford residence. Lugo's testimony that Fisher called Wilborn to invite him to participate in the robbery is consistent with Wilborn's location data, which shows him coming to Cleveland from Akron and then staying at Fisher's home for several hours before and after the murder.

{¶ 187} Fisher's explanation to police about his whereabouts — that he saw a prostitute and then went to sleep before the murder — is inconsistent with the location data from Wilborn's ankle monitor and various cellphones. Wilborn was at Fisher's house between 2:25 a.m. and 4:15 a.m. and then again from 6 a.m. to 9 a.m. after the murder. Between 12 a.m. and 2 a.m. on April 8, 2021, phones belonging to Rias, Washington, Fisher, Wilborn and Ransom were located in the general area of the Union Avenue home, consistent with the coconspirators' testimony. Phones

belonging to Fisher and Rias were in the general area of the Harvard Avenue residence at various points between 2:00 a.m. and 4:22 a.m.

{¶ 188} This location data is more consistent with the testimony of Lugo and Washington about the events leading up to and following the murder. Moreover, Fisher was included in a group message-chain in which Ransom and others discussed law enforcement's actions in investigating the shootings.

{¶ 189} After a thorough review of the record, we cannot say that this is an exceptional case where the trier of fact clearly lost its way and created a manifest miscarriage of justice by finding Fisher guilty of aggravated murder and murder.

{¶ 190} There seems to be no dispute about Fisher's previous convictions, and his convictions on the firearm specifications and having-weapons-under-disability count are not against the manifest weight of the evidence, either.

### 4. Analysis — The Drive-By Shooting of the Crawfords' Residence

{¶ 191} As for the drive-by shooting into the Crawfords' residence, Fisher reiterates his position that the evidence supports that he was not present in either of the vehicles when the shooting occurred. Continuing, Fisher argues that even if he were in one of the cars, there was insufficient evidence to conclude that he was complicit in the shooting. Finally, he argues that there was no evidence that the shooters intended to harm the Crawfords. Indeed, he says that the evidence supports a conclusion that no one in the group that went to the area of the shooting that night "knew or had reason to know that anyone was at the Crawfords' house."

{¶ 192} As for the latter argument, we disagree that no one in the group had reason to know that the Crawfords were home. The entire purpose of driving to the area was to rob the Crawfords at their home. Fisher position is that he believed Rias and the Crawfords were trying to "set them up" for some kind of ambush. Moreover, it was the early morning, when it is reasonable to expect that people could be home. The shots were fired into windows and walls on the first and second floors of the home, while members of the Crawford family were asleep inside. *Compare In re R.W.*, 2009-Ohio-1255 (8th Dist.) (the defendant fired bullets into the air when the alleged victims were in a location such that they could not have been hit when the bullets fell); *State v. Jackson*, 2019-Ohio-3357 (8th Dist.) (the defendant swung a golf club, but not in a manner that it may have hit the alleged victims). In other words, there was "an overt act directed toward physical harm" which went "beyond behavior that merely causes another to believe physical harm is imminent." *See State v. Clark*, 1991 Ohio App. LEXIS 3353 (8th Dist.).

{¶ 193} Considering the complicity statute, there was sufficient evidence for the court to find Fisher guilty of complicity in the offenses stemming from the drive-by shooting beyond a reasonable doubt. His actions before, during and after the shooting suggest that he was not a mere bystander but rather complicit in those offenses.

{¶ 194} The coconspirators' testimony established that Fisher was a central participant to the planned robbery of the Crawfords, even recruiting Wilborn to come up from Akron to join the group. When Fisher came to believe that Rias was

setting them up, Fisher conferred with Ransom about killing Rias and, after doing so, traveled with the group past the Crawford residence, where other conspirators fired numerous rounds into the living spaces of the house. Fisher then traveled with members of the group back to Ransom's home and then his own home, where he hosted Lugo and Wilborn as they slept. Fisher and other members of the group then traveled together out of state. During the investigation, members of the group communicated electronically and expressed concern that Fisher had been contacted by law enforcement.

{¶ 195} While Fisher did not shoot into the Crawford residence, his aiding and abetting that shooting can reasonably be inferred from his presence, companionship and conduct before and after the offense was committed. *See Howard* at ¶ 23.

{¶ 196} As to manifest weight, Fisher points out that the State conceded that Fisher was not in the car from which the shots were fired. He points out that there was no DNA or ballistic evidence tying him to a firearm on the date in question. The codefendant cooperators testified in exchange for beneficial plea agreements.

{¶ 197} As discussed further above, the location and forensic evidence is consistent with Lugo's and Washington's testimony and can be viewed as contradicting Fisher's argument that he was home asleep all night with no knowledge of the events of the evening.

{¶ 198} After a thorough review of the record, we cannot say that this is an exceptional case where the trier of fact clearly lost its way and created a manifest

miscarriage of justice by finding Fisher guilty of complicity in felonious assault and improper discharge into a habitation, along with the attached firearm specifications.

{¶ 199} Fisher's first assignment of error is overruled.

## B. Second Assignment of Error — Double Jeopardy and Allied Offenses

{¶ 200} In his second assignment of error, Fisher contends that (1) the trial court erred by imposing prison sentences on the firearm specifications in the case, (2) the offense of having weapons while under disability should have merged either with aggravated murder or with one of the offenses stemming from the drive-by shooting and (3) the offense of felonious assault should have merged with the other offenses stemming from the drive-by shooting.

### 1. Firearm Specifications and Double Jeopardy

{¶ 201} Fisher first requests that we vacate all the sentences imposed on the firearm specifications, arguing that the imposition of additional terms of imprisonment on the firearm specifications put him in double jeopardy for the same offense.

{¶ 202} Because Fisher did not raise the issue of double jeopardy before the sentencing court, we review only for plain error. *E.g.*, *In re J.T.*, 2017-Ohio-7723, ¶ 15 (8th Dist.).

{¶ 203} Crim.R. 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." An appellate court notices plain error "'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'"

*State v. Barnes*, 94 Ohio St.3d 21, 27 (2002), quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. Plain error "must be an 'obvious' defect in the trial proceedings" and we will not find plain error unless, but for the error, the outcome would have been different. *Barnes* at 27; *Long* at paragraph two of the syllabus; *State v. Gardner*, 2008-Ohio-2787, ¶ 78. "The burden of demonstrating plain error is on the party asserting it." *State v. Payne*, 2007-Ohio-4642, ¶ 17.

{¶ 204} The Double Jeopardy Clause of the Fifth Amendment to the U.S. Constitution states that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." This protection applies to defendants in state criminal prosecutions through the Fourteenth Amendment to the U.S. Constitution. *State v. Brown*, 2008-Ohio-4569, ¶ 10, citing *Benton v. Maryland*, 395 U.S. 784 (1969). Similarly, the Ohio Constitution provides: "No person shall be twice put in jeopardy for the same offense." Ohio Const., art. I, § 10. The protections afforded by the double-jeopardy clauses of the Ohio and U.S. Constitutions are "coextensive." *State v. Mutter*, 2017-Ohio-2928, ¶ 15, citing *State v. Martello*, 2002-Ohio-6661, ¶ 7.

{¶ 205} The prohibition against double jeopardy "protects against three abuses": (1) "'a second prosecution for the same offense after acquittal,'" (2) "'a second prosecution for the same offense after conviction'" and (3) "'multiple punishments for the same offense.'" *State v. Ruff*, 2015-Ohio-995, ¶ 10, quoting *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969), *overruled on other grounds*, *Alabama v. Smith*, 490 U.S. 794 (1989).

{¶ 206} Fisher's argument implicates only the prohibition against multiple punishments. He asserts — without citation to caselaw — that imposing a prison sentence on a firearm specification in addition to the underlying felony constitutes "multiple punishments for the same offense." He points out that, in this case, the trial court imposed a prison sentence for the offense of having weapons while under disability, then imposed separate prison sentences for the firearm specifications attached to other offenses, a situation that he says amounts to multiple punishments for the same offense. He takes special aim at the sentences imposed on the firearm specifications attached to the aggravated murder and murder counts, asserting that, because murder merged into aggravated murder, the trial court could not have imposed a prison sentence on the firearm specifications attached to both counts without violating double jeopardy.

{¶ 207} The State responds by directing us to *State v. Ford*, 2011-Ohio-765; and argues that the Ohio Supreme Court has already determined that firearm specifications are not separate criminal offenses but rather enhanced penalties, thus avoiding any implication of the prohibition against multiple punishments.

{¶ 208} The issue is well-settled.

{¶ 209} A firearm specification is not a criminal offense but rather a sentencing provision. *Ford* at ¶ 16–19. The sentencing provision requires an enhanced penalty for an underlying offense upon certain findings. *Id.* at ¶ 16 ("*[I]f a defendant is convicted of a felony offense and, during the commission of that offense, if the defendant displays, indicates possession of, or uses a firearm . . . the*

defendant's underlying felony sentence will be increased by three years") (Emphasis in original). Thus, a firearm specification and its predicate offense are not allied offenses subject to merger. *See id.* at ¶ 19. Ohio courts have continuously held that a trial court does not violate the Double Jeopardy Clauses of the U.S. and Ohio Constitutions by sentencing a defendant to a prison term for a firearm specification that is consecutive to the sentence imposed for the underlying offense. *See, e.g.*, *In re J.T.*, 2017-Ohio-7723, ¶ 20–24 (8th Dist.); *State v. Tango*, 2015-Ohio-5133, ¶ 17 (8th Dist.); *State v. Hamilton*, 2009-Ohio-3595, ¶ 36 (8th Dist.); *State v. Edwards*, 1991 Ohio App. LEXIS 4266 (8th Dist.); *State v. Wright*, 2018-Ohio-668, ¶ 21–23 (1st Dist.).

{¶ 210} Moreover, the Double Jeopardy Clauses permit cumulative punishment if the legislature has authorized it. *Missouri v. Hunter*, 459 U.S. 359, 366 (1983) ("With respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended."); *State v. Bollar*, 2022-Ohio-4370, ¶ 20. Thus, whether the trial court erred by not merging the having-weapons-under-disability and felonious-assault counts with other offenses, or by imposing a sentence on the firearm specification attached to the merged murder count, will depend on whether those sentences were authorized under the Ohio Revised Code.

{¶ 211} We turn first to a consideration of the allied-offenses statute. We will then consider the firearm specification attached to the murder count in discussing Fisher's third assignment of error.

### 2. Allied Offense Analysis

{¶ 212} Fisher requests that we vacate the sentences imposed on the having-weapons-under-disability and felonious-assault counts and remand this matter for resentencing with instructions that those offenses should merge with other offenses. He argues that the underlying offenses were allied offenses of similar import subject to merger. The State defends the trial court's merger decision, arguing that the having-weapons-under-disability and felonious-assault offenses were not allied offenses of similar import with any other offense in the case.

{¶ 213} R.C. 2941.25, Ohio's allied-offenses statute, states:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 214} In determining whether offenses are subject to merger for sentencing under R.C. 2941.25, courts evaluate three separate factors — the import, the conduct and the animus. *State v. Ruff*, 2015-Ohio-995, paragraphs one and three of the syllabus. Offenses do not merge, and a defendant may be convicted of and sentenced

for multiple offenses if any one of the following is true: (1) the offenses are dissimilar in import or significance, (2) the offenses were committed separately or (3) the offenses were committed with separate animus or motivation. *Id.* at paragraph three of the syllabus, ¶ 25, 31. "The defendant bears the burden of establishing his entitlement to the protection provided by R.C. 2941.25 against multiple punishments for a single criminal act." *State v. Washington*, 2013-Ohio-4982, ¶ 18; *see also State v. Davids*, 2022-Ohio-2272, ¶ 43 (8th Dist.); *State v. Burey*, 2021-Ohio-943, ¶ 17 (8th Dist.).

{¶ 215} Offenses are dissimilar in import or significance within the meaning of R.C. 2941.25(B) "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Ruff* at ¶ 23. Thus, "a defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other offense." *Id.* at ¶ 26. "The evidence at trial or during a plea or sentencing hearing will reveal whether the offenses have similar import." *Id.*

{¶ 216} Offenses are committed separately within the meaning of R.C. 2941.25(B) if "'one offense was complete before the other offense occurred, . . . notwithstanding their proximity in time and that one [offense] was committed in order to commit the other.'" *State v. Woodard*, 2022-Ohio-3081, ¶ 38 (2d Dist.), quoting *State v. Turner*, 2011-Ohio-6714, ¶ 24 (2d Dist.). Thus, "'when one offense is completed prior to the completion of another offense during the defendant's

course of conduct, those offenses are separate acts.'" *Woodard* at ¶ 38, quoting *State v. Mooty*, 2014-Ohio-733, ¶ 49 (2d Dist.).

{¶ 217} For purposes of R.C. 2941.25(B), animus has been defined as "'"purpose or more properly, immediate motive."'" *State v. Priest*, 2018-Ohio-5355, ¶ 12 (8th Dist.), quoting *State v. Bailey*, 2014-Ohio-4684, ¶ 34 (8th Dist.), quoting *State v. Logan*, 60 Ohio St.2d 126, 131 (1979). "'If the defendant acted with the same purpose, intent, or motive in both instances, the animus is identical for both offenses.'" *State v. Lane*, 2014-Ohio-562, ¶ 12 (12th Dist.), quoting *State v. Lewis*, 2012-Ohio-885, ¶ 13 (12th Dist.). "Animus is often difficult to prove directly but must be inferred from the surrounding circumstances." *Lane* at ¶ 12, citing *State v. Lung*, 2012-Ohio-5352, ¶ 12 (12th Dist.).

{¶ 218} "At its heart, the allied-offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct" and "an offense may be committed in a variety of ways." *Ruff*, 2015-Ohio-995 at ¶ 26, 30. "'[T]his analysis may be sometimes difficult to perform and may result in varying results for the same set of offenses in different cases. But different results are permissible, given that the statute instructs courts to examine a defendant's conduct — an inherently subjective determination.'" *Ruff* at ¶ 32, quoting *State v. Johnson*, 2010-Ohio-6314, ¶ 52 (plurality opinion per Brown, C.J.).

{¶ 219} With respect to the Crawford home shooting, Fisher was convicted of felonious assault, improperly discharging into habitation and improperly handling firearms in a motor vehicle. He would have felonious assault merge with

the other offenses, as well as his conviction for having weapons while under disability. We disagree.

{¶ 220} It is well-settled that improperly discharging a firearm into a habitation and an associated assault charge are not allied offenses of similar import, as Fisher's counsel conceded at the sentencing hearing. *See State v. Grayson*, 2017-Ohio-7175, ¶ 24–25 (8th Dist.); *State v. Scott*, 2018-Ohio-3791, ¶ 35 (8th Dist.); *State v. Sawyer*, 2020 Ohio App. LEXIS 1366 (1st Dist.). This is because the "harm caused by improperly discharging a firearm into a habitation is to the 'occupied structure' itself," whereas the harm from a felonious assault is to an individual. *Grayson* at ¶ 24–25.

{¶ 221} Under the facts of this case, the offenses of felonious assault, improperly handling firearms in a motor vehicle and having weapons while under disability were committed separately and did not share an animus. This court has discussed that the animus of having a weapon while under a disability is "making a conscious choice to possess a weapon." *State v. Cowan*, 2012-Ohio-5723, ¶ 39 (8th Dist.). Where a defendant acquires a weapon sometime prior to committing a separate crime, "[t]he fact that he then used the weapon[] to commit the other crimes does not absolve [the defendant] of the criminal liability that arises solely from his decision to illegally possess the weapon." *Id.* Here, then, that offense was complete when Fisher made the conscious choice to possess a firearm. The offense of improper handling was complete when Fisher knowingly transported the firearm in the vehicle and was complicit in others' transporting firearms in a vehicle. *See*

*State v. Clark*, 2016-Ohio-1560, ¶ 8–9 (2d Dist.); *State v. Wesley*, 2017-Ohio-299, ¶ 18 (7th Dist.). And the offense of felonious assault was complete when Fisher was complicit in the drive-by shooting into the Crawford residence.

{¶ 222} The same reasoning applies as between the having weapons while under disability offense and the offenses stemming from Rias' murder. The former offense was complete when Fisher made the conscious choice to possess a weapon. The latter offenses were complete when Fisher used that firearm to kill Rias. Having weapons while under disability involved different conduct, at a different time and with a separate animus from the other offenses.

{¶ 223} As felonious assault and having weapons while under disability were not allied offenses of similar import with any other offense in this matter, the trial court did not err when it chose to impose separate sentences on those offenses.

{¶ 224} Because imposing consecutive prison terms on firearm specifications and the underlying offenses does not violate double jeopardy, and because felonious assault and having weapons while under disability were not subject to merger, we overrule Fisher's second assignment of error.

## C. Third Assignment of Error — Firearm Specification

{¶ 225} Fisher argues that the trial court erred when it imposed a 54-month prison term on the firearm specification attached to Count 9 (murder), consecutive to other sentences. He contends that, because the offense of murder merged into the offense of aggravated murder at sentencing, the trial court was not permitted to impose a sentence on the firearm specification attached to the murder count.

{¶ 226} A court generally cannot impose more than one firearm-specification term on an offender "for felonies committed as part of the same act or transaction." *See* R.C. 2929.14(B)(1)(b). There is an exception, however. R.C. 2929.14(B)(1)(g) specifically provides as follows:

> If an offender is convicted of or pleads guilty to two or more felonies, if one or more of those felonies are aggravated murder, murder, . . . [or] felonious assault, . . . and if the offender is convicted of or pleads guilty to a [firearm specification] in connection with two or more of the felonies, the sentencing court shall impose on the offender the prison term specified . . . for each of the two most serious specifications of which the offender is convicted or to which the offender pleads guilty and, in its discretion, also may impose on the offender the prison term specified . . . for any or all of the remaining specifications.

{¶ 227} Fisher concedes that the Ohio Supreme Court in *State v. Bollar*, 2022-Ohio-4370, held that R.C. 2929.14(B)(1)(g) requires a trial court to impose separate prison terms for each of the two most serious firearm specifications when the offender is found guilty on multiple felony offenses (when at least one of which is an enumerated offense) and multiple firearm specifications — even when an underlying offense ultimately merges into another offense. *See Bollar* at ¶ 16, 19 (holding that "the plain language of R.C. 2929.14(B)(1)(g) indicates that a firearm specification survives merger").

{¶ 228} Fisher candidly states that he raises this assignment of error to preserve the issue for later review. He attempts to distinguish *Bollar* by pointing out that the Supreme Court, in that case, did not explicitly consider the statutory rule of lenity, R.C. 2901.04(A). The rule of lenity states that "sections of the Revised

Code defining offenses or penalties shall be strictly construed against the state, and liberally construed in favor of the accused." R.C. 2901.04(A).

{¶ 229} Fisher argues that, because there was a dissenting opinion in *Bollar*, reasonable minds could disagree with its holding and thus the rule of lenity requires us to read R.C. 2929.14(B)(1)(g) in his favor.

{¶ 230} As an intermediate court, we do not have the authority to review or overturn decisions of the Ohio Supreme Court. *E.g.*, *Zakel v. State*, 2022-Ohio-4637, ¶ 7 (8th Dist.). The holding of *Bollar* applies to the facts of this case and thus is controlling precedent. The Supreme Court specifically held that a firearm specification survives merger under the plain language of R.C. 2929.14(B)(1)(g) and that there is no violation of double jeopardy when a trial court complies with the statute in imposing a separate sentence on such a specification. In light of *Bollar*, there is no ambiguity as to that issue to which the rule of lenity might apply. *See State v. Arnold*, 61 Ohio St.3d 175, 178 (1991) (the rule of lenity "applies only where there is ambiguity in or conflict between the statutes.")

{¶ 231} We, therefore, overrule Fisher's third assignment of error.

## III. Conclusion

{¶ 232} Having overruled Fisher's assignments of error for the reasons stated above, we affirm the judgment.

The court finds there were reasonable grounds for this appeal.

It is ordered that the appellee recover from the appellant the costs herein taxed.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, PRESIDING JUDGE

EILEEN T. GALLAGHER, J., and
MICHAEL JOHN RYAN, J., CONCUR